IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-279 |
| IVORY S. COUSINS | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Everett R. Witherell and Jessica Rice, Assistant United States Attorneys, hereby submits this Sentencing Memorandum. Sentencing is scheduled for July 24, 2025. In considering the Section 3553(a) sentencing factors, the government respectfully suggests that a sentence within the advisory sentencing guidelines range of 87 months to 108 months would be appropriate in this case.

**I.   INTRODUCTION**

On August 6, 2024, a grand jury sitting in the Eastern District of Pennsylvania returned a four-count indictment charging defendant Ivory Cousins with three counts of deprivation of rights under color of law and one count of falsification of records, all in violation of Title 18, United States Code, Sections 242 and 1519.

The indictment alleged that on or about August 22, 2019, while the defendant was working at the Curran-Fromhold Correctional Facility as a correctional officer, she deprived an inmate whose initials are D.J. of his constitutional rights by ignoring his need for medical attention after he was brutally assaulted by numerous other inmates, unreasonably pepper spraying the injured D.J., and helping inmates to steal D.J.'s personal belongings after he had been removed from his cell. The indictment also charged that the defendant provided false statements in her written report

about the incident, lying about D.J.'s aggressiveness, her attempts to quell his aggression, and that she recovered a weapon from his bunk, all in an attempt to conceal her unlawful conduct toward D.J.

On April 10, 2025, following a three-day jury trial, the defendant was found guilty of all counts charged against her in the indictment.

## II.     FACTS OF THE CASE

The evidence at trial established the following facts:

In August 2019, Ivory S. Cousins was a correctional officer at the Philadelphia Department of Prisons ("PDP") Curran-Fromhold Correctional Facility ("CFCF"). PSR ¶ 9. On the evening of August 22, 2019, she was on duty with a partner in a pod at the prison. A few minutes before 8 p.m., while her partner was away from the area, Cousins unlocked the door to the cell in which inmate D.J. was housed and left the door unlocked. *Id*. Approximately 15 minutes later, other inmates began lining up near D.J.'s cell door. A few minutes after that, at approximately 8:12 p.m., numerous inmates entered D.J.'s unlocked cell door, went inside, and viciously beat him. *Id*. The assaulting inmates broke D.J.'s nose and left him with visible bloody and swollen injuries to his face and head. *Id*. Cousins went to D.J.'s cell door immediately after the attack, as some of the assaulting inmates were still walking away from D.J.'s cell. She went inside D.J.'s cell with him, where she could see his obvious and fresh injuries. Instead of calling for medical help for D.J. or notifying her partner of D.J.'s injuries and asking him to call for medical assistance, she locked D.J. inside his cell, alone, for over an hour. During that time, she had ample opportunity to call for medical assistance for D.J. She never did. PSR ¶¶ 9-11.

About ten minutes after the assault, the Sergeant coincidentally entered the unit to deliver inmate legal mail. He had a conversation with Cousins near D.J.'s cell door, where, unknown to

the Sergeant, D.J. was locked inside alone with his fresh head injuries. The Sergeant was the person to whom Cousins should have reported D.J.'s injuries. She never did. Instead, she positioned her body between the Sergeant and D.J.'s cell door in a manner to block the Sergeant's view of the door. She said nothing to him about the assault, D.J.'s injuries, or his need for medical attention. The Sergeant finished with the mail and left the unit unaware that D.J. needed assistance. *Id.*

While on routine tour a few minutes after 9 p.m., Cousins' partner unlocked D.J.'s cell door and saw that he was injured. He noticed that D.J.'s face was bloodied, distorted, and swollen in multiple places. PSR ¶ 11. This was the first that Cousins' partner became aware that D.J. was injured. When Cousins saw her partner at D.J.'s cell door, she left the correctional officer desk and walked over to D.J.'s cell, intervening in their discussion. Seeing D.J.'s injuries for the first time, Cousins' partner asked what happened. Cousins told him that D.J. fell. Cousins' partner told D.J. he had to get medical attention. Both correctional officers left D.J., and Cousins locked D.J. inside once again. Cousins' partner then placed a phone call to the Sergeant to request that the Sergeant come to their unit due to an incident. *Id.* The time between the call to the sergeant and the sergeant's arrival on the unit was approximately 12 minutes. In that time the defendant devised a plan for one of the inmates who assaulted D.J. to engage in a second fight with D.J. in the common room, which would be caught on camera. (There are no cameras inside inmate cells for privacy reasons.) This second assault was intended to provide an alternative explanation for D.J.'s injuries and make it difficult to determine which injuries were attributable to the initial assault which occurred after the defendant left D.J.'s cell door unlocked. PSR ¶ 12.

When Cousins unlocked D.J.'s cell door at about 9:30 p.m. to allow the other inmate to fight D.J. on camera, however, D.J. jumped out of his cell, and the other inmate backed off and moved away. There was no physical contact between D.J. and the inmate who, with Cousins,

3

approached D.J.'s door with his fists up. When she could see that no fist fight was going to occur, Cousins then locked D.J. back in his cell, put one of his cellmates inside with him, and remained by the cell door looking inside through the window in the door. Moments later, she unlocked D.J.'s cell door and pepper sprayed the injured D.J. in the face, inside his cell. She did not spray his cellmate. PSR ¶ 13.

The Sergeant who had been called by Cousins' partner arrived in the area at around the same time that Cousins pepper sprayed D.J. The Sergeant sorted out that only D.J. had been pepper sprayed, and he escorted D.J. out of the pod to go to the medical unit. The door to D.J.'s cell was locked behind him as he and the Sergeant left the area. The inmates who had assaulted D.J. earlier in the evening then spoke to Cousins near D.J.'s locked cell door. After a few minutes, Cousins turned and unlocked D.J.'s cell door and allowed one of the inmates who had participated in the earlier assault on D.J. to go inside the cell and steal D.J.'s personal belongings. PSR ¶¶ 13-14.

The whole unit was then put on lockdown, and inmates were required to return to their cells. D.J.'s cellmates were required to clean their cell of the blood and pepper spray. While they were doing so, a few minutes before 10 p.m., Cousins entered D.J.'s cell for the first time since she had pepper sprayed him. While Cousins was inside D.J.'s cell, his cellmate gave Cousins a make-shift knife. At approximately 10 p.m., after talking to D.J.'s cellmates and leaving D.J.'s cell, Cousins walked to the correctional officer desk with the make-shift knife in her hand. At the desk, she showed it to her partner. It was the first he heard about any weapon being involved in the incident. Cousins' partner told her to report the weapon to the Sergeant. PSR ¶ 15.

Later that night, Cousins completed a written statement about the incident that falsely claimed that she pepper sprayed D.J. because she saw him trying to stab his cellmate with a weapon that she claimed she recovered from D.J.'s bunk and that she gave loud verbal commands for D.J.

4

to drop the weapon but he refused. PSR ¶ 17.

After D.J. was assessed at the CFCF medical unit, the doctor determined that, due to D.J.'s head injuries, he should be evaluated at a hospital. D.J. was transported to Jefferson Torresdale Hospital that night and was admitted. The hospital records confirm that D.J. sustained a broken nose; "significant facial swelling" to his jaw, around both eyes, and his ear; abrasions to his face and chest; and had neck and shoulder pain. He reported to the hospital staff that he had been assaulted "by several individuals just prior to arrival." The hospital administered morphine for his pain and performed a CT scan of his head and x-rays of his upper body. PSR ¶ 16.

### III. SENTENCING CALCULATION

#### A. Statutory Maximum Sentences

The statutory maximum penalty for each of Counts One and Two, which charge a violation of 18 U.S.C. § 242 that resulted in bodily injury and/or involved the use of a dangerous weapon, is: ten years of imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment. The statutory maximum penalty for Count Three, which charges a violation of 18 U.S.C. § 242 (and did not result in bodily injury to the victim or use of a dangerous weapon) is: one year of imprisonment, a $250,000 fine, and a $100 special assessment. The statutory maximum penalty for Count Four, which charges a violation of 18 U.S.C. § 1519, is: 20 years of imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 41 years of imprisonment, three years of supervised release, a $1 million fine, and a $400 special assessment. Full restitution shall also be ordered.

#### B. Sentencing Guideline Calculation.

The presentence report correctly calculates Cousins' guideline range. Counts 1, 2, and 3 are grouped because the counts involve the same victim and two or more acts or transactions

connected by a common criminal objective or constituting part of a common scheme or plan, pursuant to USSG § 3D1.2(b). Count 4 is grouped with Counts 1, 2, and 3 pursuant to USSG § 3D1.2(c) because the count embodies conduct that is treated as a specific offense characteristic in or adjustment to the guideline applicable to the other counts. Calculations are done on all counts and the count resulting in the highest offense level is applied to the group. In this case, Count 2 (depravation of right under color of law resulting in bodily injury), calculated under USSG § 2H1.1, results in the highest offense level.[1] PSR ¶ 27.

The guideline for a violation of 18 U.S.C. § 242 is USSG § 2H1.1. Pursuant to USSG § 2H1.1(a)(1), the base offense level is the offense level from the guideline for the underlying offense. The underlying offense is aggravated assault, which is calculated at USSG § 2A2.2. PSR ¶ 28. The base offense level is 14, pursuant to USSG § 2A2.2(a). *Id.* Since a dangerous weapon (pepper spray) was used, the offense level is increased by 4 levels, pursuant to USSG § 2A2.2(b)(2)(B), and since the victim sustained bodily injury, the offense level is increased by 3 levels, pursuant to USSG § 2A2.2(b)(3)(A). *Id.* The resulting base offense level is 21. *Id.*

Since the offense was committed under color of law; the offense level is increased 6 levels, pursuant to USSG § 2H1.1(b)(1)(B). PSR ¶ 29. The defendant was found guilty of falsification of records, which she knew would likely thwart an investigation or prosecution of the assault. Since the defendant willfully obstructed or impeded the administration of justice, the offense level is increased by 2 levels, pursuant to USSG § 3C1.1. PSR ¶ 30. Therefore, the defendant's total offense level is 29. PSR ¶ 33. Based upon a total offense level of 29 and a criminal history category of I, the guideline imprisonment range is 87 months to 108 months. PSR ¶ 100.

---

[1] Count 4 is calculated at USSG § 2J1.2. The cross reference at § 2J1.2(c)(1) is applicable; however, cross referencing to USSG § 2X3.1 (accessory after the fact) does not result in a higher offense level; therefore, the offense level under USSG § 2J1.2 would be 14.

IV.     ANALYSIS

The Court must consider all the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

1. **The nature and circumstances of the offense and the history and characteristics of the defendant.**

The offenses committed by Cousins are not only grave; they reflect a flagrant abuse of public trust. As the Supreme Court emphasized, public officials convicted of civil rights violations "have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold." *Koon v. United States*, 518 U.S. 81, 110 (1996). "The seriousness of section 242 crimes simply cannot be understated, as they harm far more than individual victims; society as a whole is harmed when those entrusted to protect the public and enforce the laws turn to lawlessness themselves." *United States v. Boone*, 110 F. Supp. 3d 909, 917 (S.D. Iowa 2015), *citing United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013) (finding a violation of § 241 to be a "particularly serious offense," and stating that the "evils against which this civil rights statute is directed especially include correctional officers who flagrantly beat inmates (and young ones at that) placed by the law in their charge").

A law enforcement officer's violation of the law is not comparable to an ordinary criminal's violation. Civil rights crimes go to the core of our criminal justice system, endanger the entire structure of our government, and are a threat to the republic. Inmates are under the complete control of correctional staff and are uniquely vulnerable to abuse. Correctional officers, like police officers, wield significant power. When that power is misused, it casts a long shadow over the legitimacy of law enforcement institutions. Moreover, Cousins was not a passive participant. She facilitated, concealed, and then falsified records to justify a pattern of excessive force and deliberate indifference toward a vulnerable inmate in her custody. Her actions caused physical harm and attempted to obstruct justice—each component independently warranting serious sanction.

Further, the defendant's law enforcement experience makes her conduct in connection with these crimes more blameworthy. Indeed, as the Fifth Circuit observed, "a defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor." *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000), *citing United States v. Winters*, 174 F.3d 478, 486 (5th Cir. 1999) (Sentencing Commission "applied greater not lesser sentences" for crimes committed by law enforcement officers). *See also United States v. Rybacki*, 96 F.3d 754 (4th Cir. 1996) (finding that the district court abused its discretion when it departed from the guidelines simply because the defendant was a law enforcement officer).[2]

---

[2] As explained in the PSR, Cousins alleged that she was sexually harassed by a supervisor at CFCF beginning in October 2018. PSR ¶ 24. The stress of that situation led Cousins to take a several-month leave of absence, during which she attended therapy. *Id.* ¶¶ 24, 76. Physicians deemed her fit to return to work without restriction in July 2019. *Id.* ¶ 75. This alleged harassment is a red herring in the context of the instant case. Cousins confirmed that the supervisor who allegedly harassed her was not on duty on the night she committed the charged crimes (August 22, 2019), and he had no involvement in the investigation of the incident. *Id.* ¶ 24 n.1. The sexual harassment allegations are therefore unrelated to, and do not provide an explanation or justification for, Cousins' behavior here: ignoring an inmate's serious medical needs, unreasonably pepper spraying him, helping his fellow inmates rob him, and filing a false report about the incident.

### 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense and the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

There is a strong need to impose a sentence that reflects the seriousness of these offenses, promotes respect for the law, and provides just punishment. The need for general deterrence is especially compelling in the context of officials abusing their power. As one court observed, in a decision reversing lenient sentences for corrections officers: "[t]he need for the criminal law to deter seems especially compelling here. Prison inmates serve their sentences under the pervasive control of the corrections staff. . . Indeed, they may turn only to corrections officers for protection from beatings by other inmates, let alone from punitive beatings sustained at the hands of the officers themselves." *McQueen*, 727 F.3d at 1158.

The government submits that general deterrence considerations should apply to the defendant's conviction for a civil rights violation, particularly considering the difficulty of investigating these offenses in the correctional setting and holding offenders accountable. Abuses by prison guards are difficult to uncover precisely because some officers are willing to conceal and lie about such crimes, as Cousins did in this case. *See McQueen*, 727 F.3d at 1158–59 ("The ability to unearth these crimes by law enforcement officers in a prison setting is particularly difficult, and, as we see it, the extraordinarily lenient sentences in this case sap the goal of general deterrence."). Correctional officers contemplating committing civil rights crimes, or covering up such crimes, may feel that they, like the officers who commit civil rights crimes, are unlikely to be caught. Indeed, uncovering and proving the circumstances surrounding victim D.J.'s injuries required extensive government resources and the willingness of cooperating witnesses to testify against fellow correctional officers, which are circumstances that may not be present in many cases.

A just sentence therefore should impact the decision-making of those "who may be tempted to violate the law and their oath of office to protect themselves or their fellow officers from possible state or federal criminal investigations." *United States v. Ronda*, 455 F.3d 1273, 1302 (11th Cir. 2006). Simply put, when a corrupt officer receives too lenient a sentence, it sends a signal to other officers and public servants that they too can harm others for the sole purpose of serving their own ends.

### 3. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The defendant's needs for educational or vocational training, medical care, or other correctional treatment in the most effective manner can be met by the Bureau of Prisons.

### 4. The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Section 3553(a) is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. *See United States v. Parker*, 462 F.3d 273 (3d Cir. 2006); *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct not disparities between codefendants." (citation and internal quotation marks omitted)). A sentence within the advisory guidelines range would therefore contribute to nationwide consistency in sentences.

## V.     CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence within the sentencing guidelines range of 87 to 108 months.

>                    Respectfully submitted,
>
>                    DAVID METCALF
>                    United States Attorney
>
>
>                    /s/ *Everett Witherell*
>                    EVERETT R. WITHERELL
>                    JESSICA RICE
>                    Assistant United States Attorneys

Dated: July 17, 2025

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served on the following counsel via e-mail on this date:

>Martin I. Isenberg, Esq., #38762
>Scher & Isenberg, LLC
>1528 Walnut Street, Suite 1100
>Philadelphia, PA 19102
>Phone: (215) 574-2010
>Fax: (856) 782-8825
>misenbergesq@comcast.net

>*/s/ Jessica Rice*
>Jessica Rice
>Assistant United States Attorney

Dated: July 17, 2025